(C.D. 2109)

F. W. MYERS & CO., INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided August 21, 1959)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* and *Eugene L. Girden* of counsel) for the plaintiff.

*George Cochran Doub,* Assistant Attorney General (*Murray Sklaroff,* trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

RAO, Judge: Several importations of pulpboard were classified by the collector of customs at the port of entry within the provisions of paragraph 1402 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, as solid fiber shoe board, and, accordingly, were assessed with duty at the rate of 7½ per centum ad valorem.

It is claimed in this action that the merchandise in question consists of wet-machine board, other than beer mat board, which is provided for in said paragraph 1402, as modified by the Annecy Protocol to the General Agreement on Tariffs and Trade, 84 Treas. Dec. 403, T.D. 52373, at the rate of 5 per centum ad valorem.

The respective modifications of said paragraph 1402 read as follows: T.D. 52373, *supra*:

Paper board, wallboard, and pulpboard, including cardboard (but not including leather board or compress leather, and except strawboard, solid fiber shoe board and all counter board, and pulpboard in rolls for use in the manufacture of wallboard), not plate finished, supercalendered or friction calendered, laminated by means of an adhesive substance, coated, surface stained or dyed, lined or vat-lined, embossed, printed, decorated or ornamented in any manner, nor cut into shapes for boxes or other articles and not specially provided for:

Wallboard and wet-machine board other than beer mat board_____ 5% ad val.

Other_____ 7½% ad val.

T.D. 52739, *supra*:

Leather board or compress leather, and solid fiber shoe board and
 all counter board, not plate finished, supercalendered or friction
 calendered, laminated by means of an adhesive substance,
 coated, surface stained or dyed, lined or vat-lined, embossed,
 printed, decorated or ornamented in any manner, nor cut into
 shapes for boxes or other articles and not specially provided for___ 7½% ad val.

Counsel for the respective parties have orally stipulated that the
involved merchandise is pulpboard, which is not leather board or
compressed leather, or strawboard, or counterboard, or pulpboard in
rolls for use in the manufacture of wallboard; that it is not plate
finished, supercalendered, or friction calendered, or laminated by
means of an adhesive substance, or coated or surface stained or dyed
or lined or vat-lined, or embossed or printed, or decorated or orna-
mented in any manner, nor has it been cut into shapes for boxes or
other articles; and that it is neither beer mat board nor wallboard.

In view of the provisions hereinabove set forth, and the stipulation
of the parties, it is clear that the issue has been narrowed down to the
question of whether the merchandise at bar, a sample of which is in
evidence as plaintiff's illustrative exhibit 1 (stated to be representa-
tive of the importation in all respects, except as to size and shape),
is solid fiber shoe board, as classified by the collector, or wet-machine
board, as claimed by the plaintiff.

Fred B. Oberlander, managing director and vice president of
Milmont Fibreboards, Ltd., of Montreal, Canada, the manufacturer
and exporter of the merchandise at bar, was the only witness called
to testify in this case. It appears from his testimony that, following
the completion of a course in board making, and the graphic arts,
at a school in Vienna, some 32 years prior to the trial, this witness has
been continuously engaged in the business of manufacturing pulp-
boards of various kinds in Austria, France, England, and Canada, his
experience being largely of an administrative nature, including
selling. This witness has sold pulpboard in Canada and, for the past
9 years, in the United States. He visits his customers in the United
States on an average of every 6 weeks, for the purpose of selling
fiberboards, and, in the course of so doing, has occasion to observe the
manner in which they utilize the material sold by him.

It further appears that Milmont Fibreboards, Ltd., is a manufac-
turer of wet-machine pulpboards, including solid fiber shoe boards for
counters, midsoles, heels, tucks, and shanks; electrical insulating
boards; trunk boards; "button"; cap front boards; and bookbinders'
boards. In the process of manufacturing material such as exhibit 1,
25 to 30 per centum of waste leather is combined with kraft paper
waste of different types, mashed in a beater, and dehydrated in the
beater for from 4 to 5 hours. Coloring is then added, to produce uni-

formity of color, and the mixture, then of a consistency of 6 per centum solids and 94 per centum water, is dumped into large chests, from which it is pumped through refiners on to the wet machine. This is a machine with a cylinder covered with wire, which picks up the mixture as it is pumped out of the vat. Water drains through the wire, and a very thin layer of the material is picked up by a felt and transported to a making roll, which winds the fine wet layers until specified thicknesses are achieved. This may require 40 to 50 revolutions of the making roll. The sheet is then cut off and placed in layers, interspersed with cotton sheets to prevent sticking, into a hydraulic press, which drains off a substantial amount of the water. After removal from the hydraulic press, the pulpboard sheets are completely dried in a dryer, then dampened in a spray, calendared, trimmed, and packed into bundles ready for shipment. They are shipped in the form of rectangular sheets. This is essentially the process for all wet-machine board, there being variations only in the composition of the original mixture.

Oberlander testified that he would not consider board of the type of plaintiff's exhibit 1 as solid shoe board, for the reason that it was not thick enough to be used for that purpose. He stated, "I have not seen or manufactured for the requirements of the shoe trade a board of that consistency and quality in that thickness." The board in issue would be too thin for the shoe trade. It has a thickness of approximately 50/1000 of an inch.

The four shipments involved in this case were sold to cap manufacturers in New York for use in the making of visors of different sizes and shapes, as, for example, the crescent shape of plaintiff's exhibit 1. Pulpboard of the particular thickness of that exhibit has never been sold by this witness to any other trade. Specifications for cap front boards never exceed 55/1000 of an inch, whereas specifications for shoe boards of the suppleness of plaintiff's exhibit 1 are never below 63/1000 of an inch.

On cross-examination, this witness testified that he had no knowledge of the use of material of the quality and thickness of plaintiff's exhibit 1 as shoe board, which he defined as a general description of the class of fiberboard going into the shoe trade for use as heel boards, platform boards, midsole boards, top boards, etc. He stated that it is called by that name because it is used mostly by the shoe trade, and, in all probability, is produced by a mill which specializes in the making of shoe board. It can, however, be used for other purposes. When asked to give his experience with the shoe trade, this witness testified:

A. My experience with the shoe trade consists in selling to the shoe trade, matching or producing board to the special needs and requirements of the shoe manufacturer. There is not one shoe manufacturer who is making the

shoe in similar manner like the other one. One likes to have the harder board or softer one; one likes to have a snappier board or—it our job or my job to go and visit with the shoe manufacturers and manufacture a board which is good for their needs; their particular needs.

X Q. In other words, the selection is up to the individual shoe manufacturer as to what he considers shoe board or useful in his shoes?—A. Yes.

In support of the contention that the merchandise at bar is not shoe board, counsel for plaintiff invite our attention to the following definitions of the term "shoe board."

Webster's New International Dictionary (1950) :

A kind of hard board of highly compressed wood pulp and leather clippings used in making soles and heels of shoes.

Classification and Definition of Paper, revised edition, 1928, published by Lockwood Trade Journal Co., Inc.:

Hard fibre board, or highly compressed pulpboard, made of wood pulp and leather clippings, used in the construction of soles and heels as a substitute for leather.

To these may well be added the following from the Dictionary of Paper, second edition, published under the auspices and direction of the American Paper and Pulp Association, 1951:

A fiberboard made on a wet machine from wood pulp, waste papers, leather waste, or other waste materials, or a combination of such materials, with or without the addition of chemicals. Depending upon their end use, shoe boards may be termed counterboard, heeling board, innersole board, leather fiber, midsole board, reinforcement board, shank board, or tuck board.

It is readily apparent from the foregoing definitions that shoe board is a term implying a particular use, that is, it encompasses a class or kind of pulpboard used in the making of shoes. In customs parlance, such a provision is what is known as a use designation, and the law is well settled that where use is the criterion for determining the meaning and scope of a tariff provision, what is ordinarily contemplated is chief use. *United States* v. *James P. Heffernan Paper Co.*, 17 C.C.P.A. (Customs) 61, T.D. 43358. The query is whether the importation under discussion belongs to that class of articles chiefly used for the designated purpose at the time the provision *per se* became part of the tariff structure. *Goldsmith's Sons* v. *United States*, 13 Ct. Cust. Appls. 69, T.D. 40932; *Wilbur-Ellis Co.* v. *United States*, 18 C.C.P.A. (Customs) 472, T.D. 44762; *United States* v. *F. W. Myers & Co., Inc.*, 24 C.C.P.A. (Customs) 464, T.D. 48913. With respect to solid fiber shoe board, since the term was first enumerated as an exception to the modification of paragraph 1402 by the Annecy Protocol to the General Agreement on Tariffs and Trade, *supra*, the pertinent period of time to which the evidence must relate is at and prior to its promulgation on December 22, 1949.

The collector having classified the merchandise at bar as solid fiber shoe board within the provisions of said paragraph 1402, as modified by the Torquay protocol, *supra*, it must be presumed that he found as a fact that it belonged to a class of pulpboard chiefly used in the making of shoes. *Dorward & Sons Co.* v. *United States*, 40 C.C.P.A. (Customs) 159, C.A.D. 512; *United States* v. *Marshall Field & Co.*, 17 C.C.P.A. (Customs) 1, T.D. 43309. Plaintiff, contending otherwise, assumed the burden of disproving that finding.

Chief use is a question of fact, and whether it is to be established or negated, evidence must be adduced representative of an adequate geographical cross-section of the nation. As we have stated in the case of *L. Tobert Co., Inc., and American Shipping Co.* v. *United States*, 28 Cust. Ct. 456, Abstract 56581, affirmed in 41 C.C.P.A. (Customs) 161, C.A.D. 544:

In order to succeed in their contention that the articles under consideration are not illuminating articles, it was incumbent upon plaintiffs to establish by competent evidence that the articles are not chiefly used for illuminating purposes. * * * The fact of chief use is difficult to prove. It ordinarily entails rather exacting evidence of use throughout the United States and cannot depend upon evidence of use locally. It appears from the record that the testimony of plaintiffs' witnesses to which reference has been made, *supra*, covered a relatively narrow field—in and about New York, with an isolated instance in Oklahoma—which certainly falls short of the requirements of proof of chief use. [Cases cited.]

It must be remembered, moreover, that evidence with respect to the imported pulpboard, though relevant, is not controlling of the issue of whether or not it belongs to the class of boards chiefly used in the making of shoes. *United States* v. *C. J. Tower & Sons*, 26 C.C.P.A. (Customs) 1, T.D. 49534.

In one significant aspect the evidence in the instant case is insufficient to support the position taken by the plaintiff herein. There is not a scintilla of proof tending to show to whom, on what scale, or in what areas of the United States, the witness for the plaintiff has sold pulpboard for use in the manufacture of shoes. His experience with the shoe trade is not defined, and there is no testimony to substantiate his conclusions that wet-machine board of the thickness and flexibility of the merchandise at bar would not be satisfactory for use in the manufacture of shoes. From a geographical standpoint, the testimony of the witness encompasses only sales to hat manufacturers in New York and in St. Louis, if he may be credited with knowledge of the use by the ultimate consumer in the latter city of merchandise sold to a jobber in New York.

Without evidence to show under what circumstances this witness had sold board which he acknowledges to be shoe board and used as such, his statement that he has not seen or manufactured a board of that

thickness, quality, and consistency for the requirements of the shoe industry carries little, if any, weight. The extent to which he has come in contact with that industry is not of record, and the court can not determine how he has familiarized himself with the specifications of American manufacturers of shoes. We conclude, therefore, that plaintiff has failed to show that the subject merchandise is not of a class or kind of pulpboard chiefly used in the making of shoes and the presumption of correctness attaching to the collector's classification thereof has not been overcome. All claims in the protest are overruled.

Judgment will be entered accordingly.